HAVENS (HUDDY v.). See Case No. 6,826.

## Case No. 6,232.

### The HAVRE.

### The SCOTLAND.

[1 Ben. 295.] 1

District Court, S. D. New York. July, 1867.2

COLLISION AT SEA OFF SANDY HOOK—OWNERSHIP —PLEADING—BOTH VESSELS IN FAULT—LOOKOUT —VESSEL UNDER SHORT SAIL — RIGHT OF MASTER TO BE PRESENT AT THE EXAMINATION OF HIS CREW AS WITNESSES.

1. Two sailing vessels, a bark and a ship, came in collision in the night, ten or fifteen miles southeast of Sandy Hook. Both were close hauled, the bark being on her port tack; and though the lights could have been seen at a distance of more than a mile, the lights of the ship were not seen till the green light was within a quarter of a mile off. The bark was under short sail, so that she could not tack, but only wear ship, and she did not change her course after discovering the light, till the collision. The ship saw the bark's green light ten

3 [Reprinted by permission.]

1 [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

2 [Reversed as to The Havre, in Case No. 6,-233.]

or twelve minutes before the collision. She was on her starboard tack, and did not change her course till the collision. Her lookout, after reporting the light, went aft. The pilot who was in charge of her testified that he saw the bark's green light and then her red light, and he then went to the weather side to see if there were any vessels on that side, and when he came back, the green light was again in view, and it was too late to avoid a collision. The other hands on the ship testified that they saw the lights and their changes, but with slight variations. The ship made no change of her course, and struck the bark fourteen or fifteen feet from her stern, in such a way that a slight starboard movement of the ship's wheel would have avoided the collision. On the trial, objection was made on the part of the ship, that the libellant, who had libelled as owner of the bark, had failed to prove his title. The court having suggested that the pleadings in behalf of the ship did not set forth with particularity the way in which the fault of the bark caused the collision, it was insisted, on behalf of the ship, that the allegation was explicit enough, and that if it were not, no advantage could be taken of it, because no exceptions were filed. Depositions of the crew of the ship were read, from which it appeared that when they were being taken, the proctor for the bark objected to the presence of the master of the ship, on the ground that his presence might exercise an undue influence over the witnesses, and the commissioner excluded him. To this exception was taken. *Held,* that proof of the title to the bark by her alleged owner might be given after the trial.

[Quoted in The Mary C., Case No. 9,201.]

2. The libel and answer should set out clearly and explicitly, though briefly, the facts relied on, and that in collision cases this is especially important.

3. The court has the power, in any stage of the case, to require the parties to supply any defect in the pleadings, though counsel can appeal to the court for that purpose, only by exceptions filed at the proper time.

4. The commissioner was in error in excluding the captain of the ship from being present at the taking of the depositions of his crew. It was not only his privilege but his duty to be there, especially as he was a stranger contesting his rights before a foreign tribunal. He should not have been excluded unless his contumacy compelled that course.

5. The bark was in fault for not seeing the light of the ship sooner. Being on ground where vessels are numerous and there is great danger of collision, being under short sail and not able to answer her helm promptly, and being on the port tack, it was her duty to exercise unremitting vigilance in looking out for approaching lights. If she had done so, she would have seen the light sooner, and could have kept out of the way.

[Cited in The Sunnyside, Cases Nos. 13,620, 13,622.]

6. It was the duty of the bark, having the wind on her port side, to keep out of the way of the ship, which was crossing her track so as to involve risk of collision. She gave no sufficient excuse for not doing this.

7. The lookout of the ship was remiss in leaving his post after reporting the light, and the pilot in charge was also remiss in going to look out for other vessels.

8. Every vessel is bound to avoid a collision if she can, and the fault of one approaching vessel does not authorize another to run her down.

9. After the change in the bark's lights had occurred, which was alleged to have been seen from the ship, and the green light of the bark

was alone visible, the ship might have hove her wheel to starboard and avoided the collision, and as it was clear that the only way of escape for her was to starboard her wheel, and, if she had done it, no collision would have occurred, she also must be *held* in fault for not having done so, and the damages must be apportioned.

These two cases were cross libels, the one filed by J. H. Richardson, owner of the bark Scotland, against the Norwegian ship Havre, and the other by Thomas Thommesen and others, owners of the Havre, against the Scotland, to recover the damages occasioned to the two vessels by a collision between them, which took place on the night of January 20, 1866, at sea, about ten or fifteen miles southeast of Sandy Hook. Both vessels were bound to New York.

C. M. Da Costa and C. Donohue, for the Havre.

Bowdoin, Larocque & Barlow and W. Q. Morton, for the Scotland.

SHIPMAN, District Judge. Before examining the case on its merits, I notice two preliminary questions. The first is the objection raised on the part of the Havre, that the alleged owner of the Scotland has failed to prove his title. It is intimated by the advocate of the Havre that this is not a mere technical objection; that the omission of such proof on the part of the Scotland was not a mere inadvertence, but that this issue was avoided because it could not be proved that the libellant Richardson was the owner. On the other hand, it is claimed on the part of the Scotland that the failure to prove title was inadvertent, and that this proof can be supplied without difficulty. If this latter statement is correct, I should not be justified in dismissing a suit of this character where the fact can be easily supplied. Proof of title should be made, and I will permit evidence to be gone into on both sides, on this single point, hereafter. This cannot embarrass the owners of the Havre.

The other question arose out of a suggestion of the court at the trial, on the pleadings being read, that the answer of the Havre to the Scotland's libel, and the original libel of the former, did not set forth with sufficient particularity the manner in which the alleged fault of the Scotland caused the collision. The advocate for the Havre insists that the allegation is sufficiently explicit; and that, if it is not, no advantage can be taken of it because no exceptions were filed. I think the allegation in question is not in the general sense of the law of pleading sufficiently full and specific, but as the controversy, as developed on the trial, is of a simple character, the defect in the averment is not attended with any embarrassment. No amendment will therefore be required in this court. But to avoid misapprehension hereafter, it is proper to state in this place, that I by no means accede to the suggestion of the advocate of the Havre, that all de-

fects of this character are to be overlooked by the court unless preliminarily excepted to by counsel. If counsel omit to file exceptions at the proper time, they are precluded from raising objections to the pleadings; but this court, at all times, upon its own motion, has power to compel the parties to conform their pleadings to rules laid down by the supreme court. Rule 23, in relation to libels, and rule 27, relating to answers, should be observed, as conformity thereto contributes to the clear and orderly proceedings in the case, and tends to simplify and facilitate the labors of the court. This court has more than once been embarrassed in the disposition of collision cases by the vague allegations of both libel and answer where no exceptions had been taken to either, and has, in one instance, dismissed a case on the ground that the pleadings as well as the proofs were not sufficiently explicit to found a judgment thereon. Of course it is well understood that the technical rules of special pleading at common law are not to be applied to a libel and answer in a suit in admiralty, but it is equally true that the libel, and the answer where it goes beyond a denial of allegations of the libel, should clearly and explicitly, though briefly, set forth the facts relied on. This is especially important in collision cases. Clear statements in the pleadings tend to produce an orderly arrangement of the proofs. The proofs then naturally crystallize around the allegations, which conduces to an easier and more lucid exposition of the material points in the controversy. To secure this result, the court has the power in any stage of the case to require the parties to supply any defects in the pleadings, though counsel can appeal to the court for this purpose only by exceptions filed at the proper time.

We come now to the merits of this case. The collision took place between nine and ten o'clock in the evening. The night was fair, starlight, though perhaps not with as perfectly clear atmosphere as is sometimes the case. There was a fresh breeze, blowing at the rate of ten or twelve knots. There was some sea, but not very heavy. The allegation in the Scotland's libel that it was blowing a gale, with a very heavy sea and a mist on the water, is not sustained by the proofs. The wind was about northwest by west. The Scotland was on her port tack, under short sail, and heading north by east and moving slowly, not more than three miles an hour. The Havre was heading about southwest on her starboard tack, under a heavier press of sail, and moving at the rate of eight knots. She was a ship of nearly one thousand tons burden, and the Scotland was a bark of nearly four hundred tons. The vessels had been on these respective tacks for some time preceding the collision, and were both close hauled. Both had green and red lights. The Havre discovered the green light of the Scotland about two points

on her lee bow, some two miles off, and about fifteen minutes before the collision. Those in charge of her movements assert that she did not change her course till the collision; that she was kept steadily on the wind to the last. The witnesses from the Scotland say that the Havre appeared to be passing her to leeward, and, when about abeam of the Scotland, luffed up into the wind and struck her, with her sails shaking. But this latter statement I do not credit. Upon no fair view of the evidence, as a whole, can it be entertained. I hold, therefore, as matter of fact, that the Havre kept her course by the wind from the time she discovered the Scotland's green light approaching her for about fifteen minutes, when she struçk the Scotland fourteen or fifteen feet from her stern as the latter was crossing her track in front of her. This blow carried away a large portion of the Scotland's stern, and did considerable damage. It would seem that a slight starboard movement of the wheel of the Havre would have averted the collision. Whether this could and ought to have been done is the only delicate or doubtful question in the case. This point will be considered at length hereafter. I hold that the Scotland was in fault for not having discovered the green light of the Havre sooner. This discovery was not made until the vessels were very near. Capt. Maynard, of the Scotland, saw the Havre's light immediately after it was reported, and says it was then not more than an eighth or a quarter of a mile off—of course he would not place the vessels nearer together than they actually were, in his testimony—when the Havre's light was discovered. They were, therefore, without doubt, very near, in view of his statements. Indeed, they were so near when the Havre's light was first sighted as to produce some excitement, if not alarm, on board the Scotland. This is quite evident from the fact stated in the Scotland's proofs, that her second mate came running, or, to use a more expressive phrase of Capt. Maynard, came "rushing" aft as soon as the light was announced by the lookout. The second mate saw it, four or five points on the lee bow, and immediately ran aft to report it to the captain. Now, in the then state of the weather, and the positions and courses of these vessels, the green light of the Havre could have been discovered by the Scotland probably two miles, but, beyond all doubt, more than a mile off. Yet her captain says that in fact it was first seen at a distance at the furthest of not more than a quarter of a mile. This becomes a serious fault when we consider the situation and responsibility of the Scotland. In the first place, she was on ground frequented constantly by a large number of vessels seeking and leaving the port of New York, where there is great danger of collision, as is well known to navigators. In the second place, she was under short sail, moving at a low rate of speed,

and therefore unable to obey her wheel promptly. Thirdly, being on the port tack, she was bound to keep out of the way of all vessels on the starboard tack which might be crossing her track so as to involve risk of collision. Act Cong. approved April 29, 1864, art. 12; 13 Stat. 60. In this condition, and with this responsibility on her, it was clearly the duty of the Scotland to exercise unremitting vigilance in looking out for approaching lights, that she might take timely measures to discharge her duty. If the proper vigilance had been exercised, she would have discovered the Havre's green light sooner, and could have kept out of the way without difficulty.

Now, assuming that the Scotland did not change her course at all, as her witnesses testify, from the time she discovered the Havre's green light, we have the case of two sailing vessels, in the open sea, crossing so as to involve risk of collision, and both holding their courses till a collision takes place. One should have kept out of the way while the other held her course, and the statute cited is explicit as to whose duty it was to give way—the vessel which had the wind on the port side. This was the Scotland. What excuse does she offer for not doing so? I have already pronounced her in fault for not sooner discovering the Havre's green light; but it is in evidence that she had shortened sail to such an extent that she could not tack, but only wear ship. What necessity there was for her reducing her canvas to the extent she did, does not clearly appear. As the proof stands, the wind was not sufficiently strong to have prevented her from carrying sail enough to enable her to execute any ordinary manoeuvre with reasonable promptness. There was no gale, nor any heavy sea. But the evidence fails to show that she was well manned. Though the proof is not entirely clear on this point, yet I infer that she had but five men, exclusive of the captain, two mates and steward, whereas she ought to have had eight. Her shortened sail and slow speed may have been owing to this deficiency in her crew. What she had may not have been able to work her in that breeze with the requisite sail to enable her to be handled with promptness and ease. But it may be said that, whether she was short-handed or not, she had a right to determine the amount of canvas she would carry and the speed she would make. The only remark I deem it necessary to make here is one already hinted at, and that is, that the fettered condition to which she was reduced imposed upon her the duty of exercising the most active diligence in early discovering approaching lights, so that she might take measures in time to discharge the obligations of a vessel on the port tack toward those advancing on the starboard tack.

I now come to another point in the case. It is a rule of prudence and sound sense,

often reiterated in judicial opinions, that every vessel is bound to avoid a collision if she can. The fault of one approaching vessel does not authorize the other to run her down because she happens, even through her own folly, to lie in her wake. I am well aware that where the law charges one vessel with the duty of keeping out of the way of another, the corresponding duty of the other to keep her course is to be rigorously enforced. But it is to be enforced with intelligence and in the interest of safety, and not to be enforced, or even permitted, blindly, to destructive ends. It is therefore proper, in view of the fact that the Havre clearly saw the Scotland for fifteen minutes before the collision, watched her approach, with more or less care, for two miles, and without the slightest change in her course, struck the latter only a few feet forward of her stern, to inquire whether she did her whole duty—in other words, whether the slight change in her wheel to starboard necessary, in order to have enabled her to clear the Scotland, might not, and ought not, to have been made? The witnesses of the Havre all, or nearly all, concur in stating that the Scotland presented her green light first, and continued to present it for some time. They differ as to the time this light first continued in sight, the lowest period being seven or nine minutes, and the highest, ten or twelve. This is not material. She continued for some time uniformly presenting her green or starboard light. It was, during all this time, supposed by the Havre that the Scotland was going to cross the former's weather-bow. Most of the witnesses also concur in stating that, at the end of the time named, the red light of the Scotland appeared. Some state that the green light did not entirely disappear, but grew dim—others that it entirely disappeared. The impression seems, then, to have prevailed on the Havre that the Scotland was falling off on her port helm to pass the former to leeward. Soon, however, her red light was lost, and the green reappeared. This, of course, indicated that the Scotland was then heading across the Havre's bow. The question already indicated here presents itself—could, and ought the Havre to have starboarded and fallen off so as to have cleared the stern of the Scotland? This, as I have once intimated, is the most difficult point in the case, and I have re-examined the evidence upon it with great care.

Mortensen, the mate of the Havre, after stating that he saw the green light ten or twelve minutes, says: "Next saw her red light and a little part of the green light, some two or three minutes. Then saw the green light again and shadow of the sail—its outlines. I could not (then) see the red light. The collision took place in one or two minutes." This witness adds that, after the green light reappeared, there was no time for the Havre to do anything. Rasmussen, a sailor and lookout on the Havre, after stating that he saw the green light for some time, says, "that he then saw the red light, the green partially disappearing; saw the red light and part of the green for about two minutes; then the red light disappeared, and the green again appeared in full view; then I saw the green light on our starboard bow; then the collision occurred."

Christiansen, another sailor on the Havre, says that he saw the green light for some time, then the red, with the green partially obscured, and, "I then lost sight of the red light and saw the green more plainly; then the Scotland luffed up forward of the Havre; then, for a couple of seconds, I saw nothing, * * * on account of the intervening rigging of the Havre; then I saw two masts and topsails on the Havre's starboard bow; the vessels were then in collision." Jonassen, also one of the Havre's seamen, says: "As soon as I saw the green light alone for the second time, the collision occurred; the time was so short, I cannot tell exactly; perhaps it was a minute." The Sandy Hook pilot, who was on board and in charge of the Havre, testifies that he saw the green light some ten minutes, and supposed that the Scotland was going to cross his bow; then he saw the red light, the green wholly disappearing. He then supposed the Scotland was going astern of the Havre. He was then standing on the lee side. He walked across the ship to the weather side, to see if there were any vessels on that side, and when he came back the red light had disappeared, and the green one was in full view. He says that the Scotland was then so near that he could not clear, one way or the other. He says that the Scotland's luffing, by which her red light was hidden, and her green disclosed again, occurred while he was going to and returning from the weather side of the ship.

The witnesses for the Havre were intelligent, much more so than those of the Scotland, and their testimony bears marks of becoming moderation, caution and accuracy, and I cannot resist the conclusion, from their statements, that, from the time the green light began to re-appear, and the red light disappear, there was time for the Havre's wheel to have been starboarded, and that had this been done, she would have kept away, and cleared the Scotland. It is admitted on all hands that she was easily handled. She was under favorable speed for that purpose, and although she then carried a little weather helm, yet, according to the pilot, she carried a little more forward than aft sail. And he says that after the collision, he put her helm up and she went right off, though her forward sails were all gone. The difficulty with this part of her case is, that she had no one on the lookout at this critical moment. Her lookout, who had reported the light, had gone aft. The pilot had gone to the weather side of his ship to look after other possible vessels, a duty

which belonged to some one else. The "yawing" charged on the Scotland, and the discovery of her red light, was ample notice that there might be danger, and the utmost vigilance was incumbent on the Havre. Instead of her regular lookout being permitted to go aft, he should have been kept at his post, and a trusty officer or seaman, instead of the pilot, sent forward to look for other vessels, while the lookout watched and reported every change in the Scotland's lights. Had this precaution been observed— in other words, had the lookout kept his post, and reported every change in the Scotland's light as soon as each change was visible, I have little doubt that her wheel would have been put up in time to have saved the collision.

I am inclined to the opinion that the movement of the Scotland, by which her red light was disclosed to the Havre, took place when the order was given on board the former to wear ship. This was done just about the time she discovered the Havre's green light. Her witnesses say that the execution of this order had not been commenced when the captain ordered that she be kept close by the wind. Her witnesses also deny that any movement of the Scotland was made which could have disclosed her red light to the Havre. But I accept the statement of the Havre's witnesses that they did see the Scotland's red light. I think the latter's witnesses are mistaken, and that when the order to wear, or be ready to wear, ship was given, she suffered, perhaps inadvertently, to fall off, so as to present her red light to the Havre, with her green partially obscured. The fact that her green light was not wholly hidden from the Havre, shows that she had not kept away to any great extent. Several of the witnesses of the Havre say that the Scotland could not have gone to leeward of her without falling off more. I think, therefore, that the variation in the Scotland's lights took place just about the time she discovered the Havre. Though this was but a brief time before the collision, I think that, even after these fluctuations had settled in presenting, at last, only her green light to the Havre, the latter might have hove her wheel a-starboard and avoided the collision. I can not doubt that after the Scotland did discover the Havre's light, the former kept close by the wind. I am unwilling to impute perjury to her witnesses on this point. Their salvation and that of their vessel depended upon adhering to that course. As to what they say they saw of the Havre's lights and movements, I place little confidence in it, for it is evident that there was alarm, if not panic, on board of the Scotland from the moment the second mate came rushing aft to report the discovery of the Havre's light. There was, however, no panic or alarm on the latter vessel. Her movements and those of her crew were

under perfect control, and had her lookout been forward at the critical moment, where he ought to have been, and instantly reported the last change of lights on the Scotland, the Havre might, and I think would, have cleared her.

There would then have been no doubt as to what course to pursue, for to starboard her helm was the only road toward safety, from which the vessels were separated only by a few feet. I am not called upon to explain why the pilot of the Havre left the lee side of his ship and went to the weather side to look after other vessels, or why the lookout left his station on the forecastle and went aft, or why there was no attempt whatever on the part of the Havre to avoid the collision at the moment when it was imminent. There was no confusion on board of her; no one there was paralyzed by fear, and it is difficult to repress the suspicion that, after all, she mistook the speed at which the Scotland was moving, not supposing that she was under very short sail, and therefore naturally concluding that she was moving much faster than she really was in fact, the Havre supposed that by the time she struck the line on which the Scotland was sailing, the latter would be out of the way. This is the only way I can account for the failure of at least an attempt on the part of the Havre to clear the Scotland. It follows, from these views, that a decree must be entered against both vessels, apportioning the damages. It must be understood, however, that I do not assent to the propositions of the Scotland's advocates, that the Havre was bound to alter her course simply because a collision was probable. There was risk of collision apparent for several minutes before it actually took place. The responsibility of avoiding it rested chiefly on the Scotland. She was bound to keep out of the way, and the Havre was bound to keep her course until it was apparent that the collision could not be avoided without a change on her part; and I hold her responsible on the sole ground that after it was clear that the only way of escape was for her to starboard her wheel, she failed to do it, and that if she had done it, no accident would have occurred. I am less reluctant to come to this conclusion, from the fact that there was, as I think, a remission of diligence on the part of the lookout and pilot of the Havre at the critical moment when the most exacting attention was required.

I find one ruling of the commissioner who took the depositions in this case, which requires remark, and to which exception was properly taken. After the examination of one witness on behalf of the Havre, the proctor for the Scotland objected to the presence of the master of the Havre during the examination of his witnesses and crew, on the ground "that his presence might exercise an undue influence over them, and be-

cause of his tendency to interrupt." The commissioner, after some further debate between counsel, excluded him. This was an error. So long as the captain comported himself properly, it was not only his privilege, but his duty, to be present during the taking of the proofs. This was especially so in view of the fact that he was a stranger, contesting his rights in a foreign port, and before a foreign tribunal. He was the agent of his owners, as well as the master of his ship, and rested under a double responsibility. The fact that he was to be examined as a witness did not vary his rights or duties. If he interrupted the proceedings, he could have been admonished by the commissioner, and I doubt not the latter was able to keep order. He should never have been excluded from the room, unless his contumacy compelled that course. Strangers should be treated with forbearance, and their rights shielded in the courts of every nation, especially in courts of admiralty, where laws binding alike upon all nations are administered. After the proof of ownership on the part of the Scotland is furnished, let decrees holding both vessels in fault be entered, with an order of reference to a commissioner to report the damages.

[On appeal to the circuit court by the Havre, the decree of the district court was reversed as respects the Havre, in an opinion by Blatchford, Circuit Judge. Case No. 6,233.]